ARTHUR E. OTTO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81874. Promulgated March 17, 1938.

*Charles D. Hayes, Esq.*, for the petitioner.
*Gerald W. Brooks, Esq.*, for the respondent.

## OPINION.

KERN: The question here is whether the shares of Chase National Bank stock sold by petitioner on December 31, 1932, at a loss of $8,059.68 were capital assets within the meaning of section 101 (c) (8) of the Revenue Act of 1932. If they were not capital assets, then the loss sustained by petitioner as a result of the sale would not be deductible in the taxable year of 1932 under the limitation imposed

by section 23 (r) of the revenue act, since the petitioner had no gains from sales of noncapital assets during the year. The pertinent sections of the revenue act are set out in the margin.[1]

The parties hereto agree that the sale of the stock by petitioner was made on December 31, 1932. The petitioner must have held the stock for more than two years in order that the stock might be considered a capital asset. See *Harriet M. Hooper*, 26 B. T. A. 758. The period of holding within the meaning of section 101 (c) (8) of the revenue act begins at the time petitioner acquired title. See *McFeely* v. *Commissioner*, 296 U. S. 102; *Helvering* v. *San Joaquin Fruit & Investment Co.*, 297 U. S. 496. The narrow question, therefore, for our decision is whether petitioner acquired title to the Chase National Bank stock on December 30, 1930, or, as respondent contends and has determined, on a later date. Because of this determination by respondent, the burden is on petitioner to show that title to the stock was acquired by him on the earlier date.

Petitioner contends that this question should be decided under the law of the District of Columbia, where the common law rule prevails, while the respondent contends that the law of New York should govern, in which jurisdiction the Uniform Sales Act and the Uniform Stock Transfer Act are in force. Since there is no question but that Murphy & Co. was acting as a dealer and not as a broker in making the sale of the Chase stock to petitioner, and since the contract to sell was made and the delivery took place in the District of Columbia,

---

[1] SEC. 101. CAPITAL NET GAINS AND LOSSES.

  \*       \*       \*       \*       \*       \*       \*

  (c) DEFINITIONS.—For the purposes of this title—

  \*       \*       \*       \*       \*       \*       \*

  (8) "Capital assets" means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business. For the purposes of this definition   \*   \*   \*.

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

  In computing net income there shall be allowed as deductions :

  \*       \*       \*       \*       \*       \*       \*

  (r) LIMITATION ON STOCK LOSSES.—

  (1) Losses from sales or exchanges of stocks and bonds (as defined in subsection (t) of this section) which are not .capital assets (as defined in section 101) shall be allowed only to the extent of the gains from such sales or exchanges (including gains which may be derived by a taxpayer from the retirement of his own obligations).

  (2) Losses disallowed as a deduction by paragraph (1), computed without regard to any losses sustained during the preceding taxable year, shall, to an amount not in excess of the taxpayer's net income for the taxable year, be considered for the purposes of this title as losses sustained in the succeeding taxable year from sales or exchanges of stocks or bonds which are not capital assets.

  (3) This subsection shall not apply to a dealer in securities (as to stocks and bonds acquired for resale to customers) in respect of transactions in the ordinary course of his business, nor to a bank or trust company incorporated under the laws of the United States or of any State or Territory, nor. to persons carrying on the banking business (where the receipt of deposits constitutes a major part of such business) in respect of transactions in the ordinary course of such banking business.

it is our opinion that the law of that jurisdiction governs. However, this point is not particularly important, since, even assuming in petitioner's favor that the contract was for the sale of goods and not of choses in action, it is clear that the contract was for the purchase of unascertained goods and, under the common law, as well as under the Uniform Sales Act, some act on the part of the vendor in appropriating the goods to the contract of sale was necessary before title passed to the vendee. Williston on Sales, 2d ed., vol. 1, pp. 556–557. Meyer's Law of Stock Brokers and Stock Exchanges, supplement page 35, succinctly states the law governing a case of this kind as follows:

The legal rights and duties of a stock dealer are, in the main, no different from those of a dealer or jobber in merchandise. No fiduciary or trust relationship arises out of the sale to or purchase from his customer. The contract which he makes with his customer is regarded as a contract for the sale of "unascertained goods", entitling the seller to deliver any shares of the kind sold. Title does not pass to the purchaser until there has been an appropriation by the seller of specific stock to the contract, and *mere notice of purchase or sale given by the dealer does not constitute a sufficient appropriation to effect transfer of title even if the customer has made payment.* If a dealer who has received payment in full fails to deliver or to allocate securities to the customer, the customer's remedy is merely one for breach of contract. He has no cause of action in conversion, as he would have against a broker. * * * [Italics supplied.]

The above quotation is amply supported by the authorities therein cited. A leading case on the question here is *Wills* v. *Investors' Bankstocks Corporation*, 257 N. Y. 451; 178 N. E. 755, which holds that the property in unascertained goods will pass to the buyer only when such goods in a deliverable state are unconditionally appropriated to the contract with the assent of the buyer. The goods in that case, as here, consisted of over the counter securities for which the plaintiff had given an order to a dealer to buy.

Applying the above rules to the facts in the present case, we are of the opinion that the petitioner has not shown that there was any appropriation of Chase stock to his contract on December 30, 1930. Clearly the petitioner has not established that Murphy & Co. had on hand any Chase stock on that date. The evidence on this is that Murphy & Co. had no position in the stock on December 30. This fact does not lead to the necessary inference that Murphy & Co. had acquired the stock and had appropriated it to the contract. The petitioner has not shown that such an appropriation had been made, and on this state of the record we can not make the assumption in his favor. The stock then must be treated as unascertained goods, and, so treating it, we are unable to find in the record any evidence of appropriation to the contract on December 30.

The petitioner relies largely on the case of *Dee Furey Mott*, 35 B. T. A. 195. That case is not in point here. The stock in that case was in the possession of the vendor and constituted specific ascertained goods in a deliverable state, and in the opinion emphasis was placed on that fact. In this case, as above pointed out, from the state of the record the Chase stock must be treated as having the status of unascertained goods on December 30, 1930.

Summarizing, the petitioner has not shown that there was any appropriation of shares of stock to his contract on December 30, 1930, and, therefore, he has not established that he acquired the shares on that date.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

---

MURDOCK, concurring: The reasoning of the prevailing opinion leads irresistibly to the conclusion that the period of "more than two years" during which property is "held by the taxpayer" begins only at the time title to the property passes to the taxpayer. Yet, I think it is unfortunate that the Board was required to render such a decision because I believe that a different method of computing the period of ownership has been generally used up to this time. Many purchases of securities are made by taxpayers through brokers. The broker notifies his customer that a purchase has been made upon a certain day. The customer in making up his income tax return generally uses the date of purchase in computing his period of ownership. The Commissioner has accepted and has himself applied that method of computing the period of ownership in innumerable cases. The present opinion holds that that method is not in accordance with the law. Claims for deficiencies and refunds may be expected in a great many cases as a result of this decision.

The difficulty of correctly reporting gains and losses will be increased tremendously if this opinion is followed, as will the work of the Commissioner in auditing returns. Taxpayers who have made a purchase of securities through a broker seldom know the exact day upon which title to the securities purchased passes to them. They are notified by the broker of the day upon which the purchase was made and perhaps of the settlement date. It now appears that the date of purchase is unimportant and the taxpayer-customer must learn from the broker, if he can, the facts pertaining to the passing of title. Those facts may not be readily available. The taxpayer, after he learns the facts, will have to decide the legal question of exactly when title passed. Many taxpayers are not qualified to decide that question, even with full knowledge of the facts.

Although in the present case the decision is in the Commissioner's favor, the principle established will apply equally to the advantage of taxpayers in the case of losses. If, as I have some reason to believe, this is an unfortunate decision, it may, at least, demonstrate that not all rights should be pressed through litigation. The Board, of course, has no alternative but to decide the case, and the law seems to be as stated in this opinion.

MELLOTT agrees with the above.